IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| **BRENDA WILLIAMS**, as next friend of A.W., a minor; **CHRISTA COOK,** individually and as survivor and next of kin to Chriteris Allen; **CHRISTOPHER DERICK MONTGOMERY,** individually and as survivor and next of kin to Chriteris Allen; and **CAMESHIA KINDRED**, as attorney-in-fact for **KEITH BROWN**,<br><br>Plaintiffs,<br><br>vs.<br><br>**CORECIVIC, INC., CORECIVIC OF TENNESSEE, DAMON T. HININGER, PATRICK SWINDLE, JASON MEDLIN, VANCE LAUGHLIN, GRADY PERRY, VINCE VANTELL, ELAINA RODELLA, KEITH IVENS, JOHN DOE 1 through JOHN DOE 7, HARDIN MEDICAL CENTER, WAYNE D. MURRAY, and ANTHONY RAMIREZ,**<br><br>Defendants | Case No. _____<br><br>**JURY DEMAND** |

## ORIGINAL COMPLAINT

NOW COME Brenda Williams, Christa Cook, Christopher Derrick Montgomery, and Cameshia Kindred, the Plaintiffs herein, stating and alleging as follows:

### Introduction

1. Defendant CoreCivic, Inc. is a private prison corporation with a well-known history of putting profits ahead of the health and safety of inmates. The Plaintiffs in this case include: (1) the mother of an inmate who was visibly rotting from untreated infections prior to his untimely death;

- 1 -

(2) the parents of a deceased inmate who died in his bunk because guards failed to conduct their regular rounds; and (3) an inmate who now has terminal cancer because CoreCivic ignored his illness. CoreCivic needs to be held accountable, and the Plaintiffs intend to do just that.

**Jurisdiction**

2. This Court has jurisdiction under 28 U.S.C. § 1331 because the Plaintiffs assert federal claims under 42 U.S.C. § 1983.

3. Venue is proper in this Court because some of the Defendants reside or are located in the Middle District of Tennessee, and some of the acts giving rise to this lawsuit occurred in the Middle District of Tennessee.

**Parties**

4. Brenda Williams is the mother of Joshua Williams, a 37-year-old inmate who died at South Central Correctional Facility ("SCCF"), purportedly from a drug overdose. SCCF is owned and operated by CoreCivic, Inc. and CoreCivic of Tennesse, LLC. Mrs. Williams appears as next friend of A.W., Mr. Williams's 12-year-old daughter. Mrs. Williams asserts claims on behalf of A.W. individually and in A.W.'s role as survivor and next of kin to Joshua Williams.

5. Christa Cook is the mother of Chriteris Allen, an inmate who died at age 22 in Whiteville Correctional Facility ("WCF") in Whiteville, Tennessee. WCF is owned and operated by Defendant CoreCivic, Inc. and Defendant CoreCivic of Tennessee, LLC. Ms. Cook asserts claims individually and as survivor and next of kin to Chriteris Allen.

6. Christopher Derrick Montgomery is the father of Chriteris Allen. Mr. Montgomery asserts claims individually and as survivor and next of kin to Chriteris Allen.

7. Cameshia Kindred is the sister and attorney-in-fact for Keith Brown, an inmate who previously was housed at SCCF. She asserts claims on behalf of Keith Brown.

8. CoreCivic, Inc. is a private prison company that is headquartered in Nashville, Tennessee.

9. CoreCivic of Tennessee, LLC is a wholly-owned subsidiary of CoreCivic, Inc., and it operates all of the CoreCivic facilities in Tennessee. CoreCivic, Inc. and CoreCivic of Tennessee, LLC are hereinafter referred to jointly as "CoreCivic" or "Defendant CoreCivic."

10. Damon Hininger is the chief executive officer of Defendant CoreCivic, Inc.

11. Patrick Swindle is the chief operating officer of Defendant CoreCivic, Inc.

12. Jason Medlin is the vice president of facility operations at Defendant CoreCivic, Inc.

13. Vance Laughlin is the managing director of operations for CoreCivic's Division 6, which encompasses SCCF.

14. Grady Perry is the warden of SCCF.

15. Vince Vantell was the warden of WCF at all times relevant.

16. Elaina Rodella, M.D. is CoreCivic's regional medical director for the area that includes SCCF.

17. Keith Ivens, M.D. is the medical director for CoreCivic.

18. John Doe 1 is a physician who treated (or failed to treat) Joshua Williams.

19. John Doe 2 was the watch commander on duty at the time of the death of Chriteris Allen.

20. John Does 3-7 are correctional officers who failed to check the cell of Chriteris Allen and failed to conduct head count at breakfast and lunch on the date of his death.

21. Hardin Medical Center is a medical center and hospital in Savannah, Tennessee.

22. Wayne D. Murray, M.D. is an emergency physician at Hardin Medical Center.

23. Anthony Ramirez, M.D. is an emergency physician at Hardin Medical Center.

## Facts

### A. Joshua Williams

24. On or about November 3, 2021, cellmates of Joshua Williams used a smuggled cell phone to take photographs of his infected legs:







The cellmates then used the cell phone to transmit the foregoing photographs to Joshua Williams's parents.

25. On November 11, 2021, Plaintiff Williams and her husband sent the following email to various journalists, elected officials, and CoreCivic officials, including Defendants Swindle and Medlin:

> For more than two weeks, we have called everyone possible and no one will help our son inside South Central Correctional Facility.
>
> He had dealt with what started out with a rash on his right leg and foot for about 2 months. The rash has now moved to both legs and feet. He is in PAIN, his legs and feet are BUSTING OPEN, TURNING BLACK AND BLUE, and getting worse by the day.
>
> We do not want a lawsuit and money after he is dead. We want you to TAKE CARE OF OUR SON NOW! We are tired of being lied to. Every call we make ends in frustration!
>
> We feel as though we have no other option but to seek counsel. We have done everything possible and kept a paper trail. We have seen his legs and feet at visitation and now he states that they are worst. If our son is permanently injured or dies in your care, we have proof that we tried everything possible to get him medical treatment and you did nothing to help him.
>
> We are begging for someone to please take care of our son. This has gone on far too long and we believe his life is in danger because of his medical condition now!

26. At 7:19 p.m. on the evening of November 11, 2022, Defendant Medlin sent the following email to Plaintiff Williams and her husband:

> I wanted to acknowledge receipt of your correspondence. Vance Laughlin is the Managing Director of Facility Operations that has oversight of South Central, he is working with Warden Perry and the Health Services leadership to review your concerns and provide feedback. Mr Laughlin will follow up with you before the close of business tomorrow, (11/12/21).

27. At 12:42 p.m. on November 12, 2021, Mr. Laughlin sent the following email to Plaintiff Williams and her husband:

Ms. Williams, my name is Vance Laughlin and I am Managing Director, Operations for the TDOC facilities. I have spoken with medical and administrative leadership and received all of the information concerning your sons [sic] medical treatment. I also directed the warden to bring him to medical today for another review. He has been treated appropriately. He was in our RDAP program at South Central but was removed due to a phone conversation where he was attempting to get money in to pay drug debts. He has made some poor choices through addiction that has had very negative effects on his legs and we are working with him to treat it the best we can.

I assure you he is not being ignored but he also has a responsibility to take care of himself and to make choices that will benefit his health in the long run. I appreciate you bringing these concerns to us, but I assure you he is not being ignored.

28. Less than two hours after receiving the email from Mr. Laughlin, Plaintiff Williams and her husband wrote back as follows:

> I understand our son's responsibility for caring for himself and making choices that will benefit his health. My question is why did they send him to an outside hospital and they diagnose him as having cellulitis. They gave him antibiotics and it seemed to get better. As soon as the antibiotics run out, it came back even worse. Your medical staff saw him and order injections in his hip twice a day. It had got so bad he came to visitation in a wheelchair to visit us. If this started as you have stated, why did the outside hospital not find that it was from drug use? He had 5 to 6 values [sic] of blood taken by the nurse there, and when he asked the doctor about his blood work she stated that nothing showed up. If there were drugs in his system do you not think it would have shown up.
>
> He has stated on more than one occasion he was turning in sick calls to see the nurse for her to recommend him to see the doctor. This did not happen. His feet were swollen so bad he could not wear his shoes. We had called and spoke to the director over RDAP and she told us that he was attending the class because she had seen him on the camera in the wheelchair. The day in question about him being removed from RDAP because he was attempting to get money in to pay a drug debt is somewhat alarming to me. We never talked to Joshua that day from the Prison. Another question is why would there be drugs in RDAP to be sold?
>
> Sir, poor choices through addiction are why he is in prison and that is why he was in RDAP. Dropping him from a class that was mandated by the parole board last year on a conversation that never happened, is also concerning to me. It is quite easy to be ignored when someone is placed in HSA. The contact that he is having is when the administration is trying to assign him a cell on the compound, he refuses to go to the compound because he is in fear of his life. So the Refusal of Cell Assignment creates a write-up after write-up on his jacket. All of this doesn't constitute him being in a secure environment and him receiving adequate medical treatment.

- 7 -

At 5:06 p.m., Defendant Laughlin wrote back to the Williamses and indicated that he had asked the regional medical director, Defendant Rodella, to review the case and make sure Joshua's condition was being treated appropriately.

29. Joshua died two days later on Sunday, November 14, 2021. Any layperson, much less any competent medical professional, would have known that Joshua needed urgent medical care beyond the capabilities of a prison. Nonetheless, and despite the urgent pleas of his parents, Joshua was not sent to a hospital. Instead, he was left to rot at SCCF.

30. After Joshua's death, an autopsy found systemic infections throughout his body, including pneumonia. A toxicology report found fentanyl in his blood, and the medical examiner determined that Joshua died as a result of the drug overdose. Plaintiff Williams alleges that Joshua took the fentanyl in order to alleviate the excruciating pain that he was experiencing while rotting to death from pneumonia and other infections.

31. Joshua could not have overdosed but for the fact that illegal drugs were so widely available at SCCF. For the reasons set forth below, Plaintiff Williams alleges that Defendants CoreCivic, Hininger, Swindle, Medlin, and Laughlin were deliberately indifferent to the problem of illegal drugs at CoreCivic facilities.

32. As a matter of policy, Defendant CoreCivic does not adequately screen the applicants that it hires as guards. Furthermore, the Plaintiffs intend to present testimony that the predominantly female guard staff at CoreCivic facilities often have gang affiliations or romantic relationships with gang members. Sometimes the guards have tattoos reflecting their gang affiliations, sometimes they talk about their gang affiliations in the presence of inmates, and sometimes they flash hand sings reflecting gang affiliations. Predictably, illegal gangs utilize the gang-affiliated guards to smuggle drugs into CoreCivic facilities.

33. Relatedly, and as a matter of policy, CoreCivic does not adequately screen guard staff for contraband. As a result, guards are able to bring illegal drugs into its correctional facilities. The Plaintiffs intend to present testimony that CoreCivic fails to comply with generally-accepted correctional standards for preventing the entry of contraband into its facilities.

34. Plaintiff Williams alleges that the fentanyl that killed Joshua was smuggled into SCCF by guard staff, and that they are liable for his death.

**B. Chriteris Allen**

35. Chriteris Allen was an inmate at WCF when he died from a fentanyl overdose on August 26, 2021. Fentanyl can be lethal if it is merely placed on someone's skin, and Plaintiffs Cook and Montgomery allege that Chriteris's cellmate used fentanyl to murder him as a result of ongoing personal disputes between the two.

36. Chriteris normally called his mother, Plaintiff Cook, every evening before she went to work her overnight shift. On the evening before his death, he called his mother around 8:42 p.m. Chriteris also called his mother routinely between 6:30 and 7:00 a.m. after she finished her shift, but he did not call on the day that he died. Based on that evidence and the evidence below, Plaintiffs Cook and Montgomery allege that Chriteris died somewhere between 5:30 a.m. and 7:00 a.m.

37. CoreCivic guards did not discover Chriteris's body, however, until after noon on August 26th, 2021. By that time, the rigor mortis in his body indicated that he had already been dead for 5-6 hours. TDOC policy required guards to conduct a head count at breakfast and lunch, and it required them to check inmates' cells every 30 minutes to determine whether anyone inside was moving. The guards failed to conduct the head counts and failed to check Chriteris's cell.

38. Chriteris's cellmate knew that he had missed both meals, and he knew that Chriteris had not moved since the early morning hours, yet he never notified guard staff. Furthermore, it is highly

- 9 -

Case 3:22-cv-00571   Document 1   Filed 08/01/22   Page 9 of 20 PageID #: 9

unlikely that Chriteris would have voluntarily ingested illegal drugs prior to the time that he normally woke up. For those reasons, along with the personal disputes between Chriteris and his cellmate, Plaintiffs Cook and Montgomery allege that Chriteris's cellmate placed fentanyl on him during his sleep and left him to die.

39. After Chriteris died, Plaintiff Cook learned that CoreCivic's guards did not conduct the cell checks because they were understaffed. Whereas 2-3 guards are normally assigned to a pod, only one guard was assigned to the pod on the day of Chriteris's death.

40. Had Chriteris received timely medical attention, any overdose could have been treated and reversed. He did not receive timely medical attention, however, because guard staff did not conduct their normal rounds and they did not conduct head counts at breakfast and lunch.

41. As set forth previously, CoreCivic is deliberately indifferent to the presence of illegal drugs in its facilities. Plaintiffs Cook and Montgomery allege that the drugs that killed Chriteris were smuggled into the prison by guard staff, and that they are liable for his death.

42. Plaintiffs Cook and Montgomery allege that Defendant Vantell was deliberately indifferent to understaffing and drug smuggling at WCF.

C. **Keith Brown**

43. Keith Brown was an inmate at HCCF in late 2020 when he began experiencing severe abdominal pain. On August 23, 2020, he was transferred to Hardin Medical Center, where Defendant Murray ordered a CT scan. According to medical records obtained on December 2, 2021, Defendant Murray observed a "tiny cyst" on Keith's liver, but he did not evaluate the "cyst" further. If he had, then he would have discovered a cancerous lesion.

44. Keith was sent to Hardin Medical Center again on February 6, 2021 as a result of severe, ongoing abdominal pain. Defendant Ramirez ordered an X-ray and blood tests, and Dr. Benjamin

- 10 -

Case 3:22-cv-00571   Document 1   Filed 08/01/22   Page 10 of 20 PageID #: 10

Wilkerson (a radiologist) and Defendant Ramirez interpreted the X-ray results. According to records obtained on December 12, 2021, both physicians found nothing abnormal in the X-rays, and Defendant Ramirez diagnosed Keith with stomach ulcers caused by an H. Pylori infection. Defendant Ramirez had access to Keith's medical records, which clearly indicated (1) that Keith had been suffering from abdominal pain for months and (2) that he had a "cyst" on his liver. Given the information already at his disposal, Defendant Ramirez failed to undertake reasonable steps to determine the source of Keith's illness. The delay in treatment allowed Keith's cancer to spread and become terminal.

45. In the months that followed, Keith continued to suffer from the same symptoms that he first reported in late 2020. Keith observed blood in his stool and he began losing weight. While he was still incarcerated at SCCF, Defendant Rodela ordered additional blood tests and, based on the results, insisted that Keith was still suffering from the H. Pylori infection. Keith had no medical training, and he took Dr. Rodela at her word.

46. Despite seeing Keith's medical chart and his ongoing symptoms, Dr. Rodela never ordered a CAT scan nor any other form of imaging scan.

47. Defendant Rodella has a history of deliberate indifference toward the inmates in CoreCivic's facilities. In particular, she fails to refer them for outside treatment despite the fact that CoreCivic's facilities are not equipped to provide the specialized care that is required. Plaintiff Kindred requests that the Court take judicial notice of *Robert Owen Smith v. Elaina Rodela, et al.*, (M.D. Tenn., July 27, 2022, No. 1:22-CV-00023) 2022 WL 2975297, where the plaintiff was denied treatment for his skin cancer – after it was already diagnosed – until the cancer had spread and required major surgery. Likewise, in *Stephen R. Mayes v. Dr. Elaine Rodella, et al.*, (M.D. Tenn., January 8, 2021, No. 1:20-cv-00057), Defendant Rodella and Defendant Ivens failed to

refer an inmate with a life-threatening heart condition to a facility capable of treating him. And in *James Lambert v. CoreCivic, Inc., et al.*, Case No. 1:21-CV-00053 (M.D. Tenn.), Defendant Rodella failed to seek outside care for an inmate suffering from serious liver diseases.

48. In order to save costs and increase profits, Defendants Rodella and Ivens have developed a policy of denying outside medical care to inmates, even where CoreCivic lacks the capacity to treat the illness in question. Given the litigation against CoreCivic, the Plaintiffs allege that the company directors are aware of the practice and have ratified it.

49. On October 12, 2021, Keith passed out from the increasing pain in his abdomen. At Defendant Rodella's direction, CoreCivic medical staff gave him pain medication and sent him back to his cell. Keith passed out again on or about October 16, 2021, and at Defendant Rodella's direction he was kept in CoreCivic's medical ward all day despite the fact that he was vomiting almost constantly. As usual, Defendant Rodella was trying to avoid an outside referral in order to save money for CoreCivic. Finally, Keith was sent back to Hardin Medical Center, where a CAT scan revealed a large mass in his abdomen.

50. On the same day, Keith was transferred to Jackson-Madison County General Hospital. At the Jackson hospital, Keith was sent into emergency surgery where his doctors discovered a large cancerous mass in his colon. After the surgery, Keith was diagnosed with terminal Stage 4 colon cancer.

51. Given the seriousness of Keith's medical condition, he should have been sent directly to TDOC's Lois M. DeBerry Special Needs Facility, which is designed to house inmates with complex medical problems. Instead, Keith was sent back to SCCF (despite the fact that it did not have the facilities necessary to care for someone in Keith's medical condition). SCCF's medical unit was understaffed, Keith did not receive the level of care required for his condition, and he

became dehydrated from constant vomiting. Finally, on November 17, 2021, Keith was transferred to Lois M. DeBerry.

52. Had Keith been properly evaluated at Hardin County Medical Center, Defendants Murray and Gonzales would have discovered the cancerous mass in Keith's abdomen. Likewise, had Defendant Rodella properly evaluated Keith after his trip to Hardin Medical Center, his cancer would have been discovered and it could have been treated. As a result of the needless delays in treating Keith, his cancer progressed to the point where it became terminal. Furthermore, Keith suffered extraordinary pain that could have been alleviated with timely treatment. Finally, he suffered needless pain because HCCF failed to initiate a timely transfer to Lois M. DeBerry.

**D.  A pattern and practice of deliberate indifference to inmate health and safety.**

53. The incidents involving Joshua Williams, Chriteris Allen, and Keith Brown are part of a pattern. In the years preceding the events set forth above, Defendant CoreCivic paid millions in settlements around the United States because (1) it routinely understaffed its correctional facilities, inevitably resulting in anarchy, assault, murder, and suicide; and (2) it routinely failed to provide adequate medical and mental health care to inmates.

54. In 2016, CoreCivic and its directors were sued by company shareholders because, among other things, the company misrepresented its pattern of understaffing and poor medical care, which ultimately led the Federal Bureau of Prisons to cancel its business relationship with Core Civic. Notwithstanding these and numerous other warnings, CoreCivic continued to provide inadequate staffing, supervision and medical care at its facilities, including SCCF.

55. Under the leadership of Defendant Heninger, CoreCivic has an established history of putting profits ahead of the health and safety of inmates. According to a 2011 lawsuit filed by the American Civil Liberties Union, for example, inmates referred to CoreCivic's Idaho Correctional

Center as "Gladiator School" because the understaffing led to such a violent atmosphere at the prison. CoreCivic settled the lawsuit with the ACLU, agreeing to provide minimum staff levels, but the company was held in contempt of court in 2013 because it violated the agreement and falsified records to misrepresent the number of guards on duty. In 2014, the FBI opened an investigation of the company based on its billing for "ghost employees," Idaho Governor Butch Otter ordered state officials to take control of the prison, and the company paid the state $1 million for understaffing the prison.

56. On or about February 23, 2017, a federal jury found that CoreCivic had violated inmates' Eighth Amendments rights to be free from cruel and unusual punishment by being deliberately indifferent to the serious risk posed by the company's long-standing practice of understaffing the Idaho Correctional Center. The jury did not award damages, however, because it found that the inmates' particular injuries were caused by other factors.

57. At an Oklahoma prison operated by CoreCivic, ten prisoners were involved in a fight on February 25, 2015 that left five with stab wounds. The following month, eight more were involved in another stabbing incident. In June of that year, thirty-three gang members fought with weapons and eleven prisoners were sent to a hospital. On September 12, 2015, four inmates were killed during a riot at the same facility. Inmates alleged that gangs were effectively allowed to run the prison. According to an investigation by the Oklahoma Department of Corrections, video evidence of the September 12, 2015 incident from three cameras at the facility was recorded over or deleted by CoreCivic employees. Two guards were later indicted for bringing drugs and other contraband into the prison, including one of the guards accused of failing to act during the riot. Between 2012 and 2016, one-third of all homicides in Oklahoma prisons occurred at two CoreCivic facilities, though they held just over 10 percent of the state's prison population.

58. In August of 2016, the Office of the Inspector General ("OIG") of the U.S. Department of Justice found widespread deficiencies in staffing and medical care at facilities operated for the federal Bureau of Prisons by private contractors, including those operated by CoreCivic. As a result, the Department of Justice indicated that it would phase out its relationships with private prisons. That, in turn, led to the shareholder lawsuit described above. In a separate report released on April 25, 2017, OIG found widespread understaffing at a detention facility in Leavenworth, Kansas operated by CoreCivic for the U.S. Marshals Service, with vacancy levels reaching as high as 23 percent between 2014 and 2015. Earlier, the company tried to hide the fact that it was packing three inmates into two-inmate cells at Leavenworth, contrary to prison regulations. The following excerpt appears in the April 25, 2017 OIG report:

> In 2011, without the knowledge of the [U.S. Marshals Service], the [Leavenworth Detention Center or "LDC"] took steps to conceal its practice of triple bunking detainees. LDC staff uninstalled the third beds bolted to the floor of several cells designed for two detainees and removed the beds from the facility in advance of a 2011 American Correctional Association (ACA) accreditation audit. A subsequent CoreCivic internal investigation revealed that this may have also occurred during other ACA audits of the LDC.

The Plaintiffs restate the foregoing allegations as their own.

59. In May of 2012, a riot at a federal prison operated by CoreCivic in Natchez, Mississippi resulted in the death of a guard and injuries to approximately 20 inmates and prison staff. OIG investigated and alleged the following in a report released in December of 2016:

> The riot, according to a Federal Bureau of Investigation (FBI) affidavit, was a consequence of what inmates perceived to be inadequate medical care, substandard food, and disrespectful staff members. A BOP after-action report found deficiencies in staffing levels, staff experience, communication between staff and inmates, and CoreCivic's intelligence systems. The report specifically cited the lack of Spanish-speaking staff and staff inexperience.
>
> Four years after the riot, we were deeply concerned to find that the facility was plagued by the same significant deficiencies in correctional and health services and Spanish-speaking staffing. In 19 of the 38 months following the riot, we found

> CoreCivic staffed correctional services at an even lower level than at the time of the riot in terms of actual post coverage. Yet CoreCivic's monthly reports to the BOP, which were based on simple headcounts, showed that correctional staffing levels had improved in 36 of those 38 months.

The Plaintiffs adopt the foregoing allegations as their own.

60. A state audit released in 2017 found that WCF needed 79 officers to cover 17 positions during a shift, but on average the facility provided only 57 officers per shift. The same audit found systemic problems at Hardeman County Correctional Center ("HCCC"), including understaffing and gang violence. The audit further noted that information provided by CoreCivic concerning HCCC and another facility was so incomplete that it was not possible to determine the accuracy of staffing levels. The Plaintiffs allege that CoreCivic deliberately provided incomplete information in order to disguise the fact that it was understaffing both facilities.

61. On December 12, 2017, a former guard at Trousdale-Turner Correctional Facility (operated by CoreCivic) testified before a legislative committee that she resigned from the company in September after witnessing two inmates die from medical neglect during the seven months that she worked for the company. Ashley Dixon told lawmakers that in one instance she pleaded with her superiors for three days to help a dying inmate, but to no avail, and her subsequent complaints were ignored by company officials.

62. The Plaintiffs allege that the foregoing incidents actually understate the problem. A scathing audit released by the Tennessee Comptroller on January 10, 2020 found that CoreCivic had not properly recorded information about accidents, illnesses, and traumatic injuries at three of its facilities in Tennessee, including HCCF and WCF. The same audit found that WCF was missing nearly one-third of its medical and mental health personnel during two different audit periods and that homicides were two times more likely in CoreCivic facilities than in state-operated facilities.

63. The Plaintiff has attached a copy of the original complaint from *G. Marie Newby vs. CoreCivc of Tennessee, LLC, et al.*, which is pending before this Court as Case No. 3:22-cv-00093. The Plaintiffs incorporate that complaint as well as its exhibits (Dkt. #s 1-1 through 1-8) by reference as if fully set forth therein. Paragraphs 1-10 the *Newby* complaint show that Defendant CoreCivic systematically disregarded inmate safety for the purpose of increasing profits. Paragraphs 32, 58, 69-71, 75-76, 84, and 86-87 set forth how Defendant Hininger was fully aware of Defendant CoreCivic's practice of putting profits ahead of inmate safety. Defendant Hininger further was aware of Defendant CoreCivic's policy of deliberate difference toward inmates' medical needs based on widespread media reports of inadequate medical care at the company's facilities. *See, e.g.,* "Mexican man's widow sues over Otay Mesa jail death, says pleas for help ignored," March 23, 2017 *The San Diego Union-Tribune*, https://www.sandiegouniontribune.com/news/courts/sd-me-detention-lawsuit-20170323-story.html; "Lawsuit: CoreCivic Staff Ignored Scabies Infection For A Full Year," July 31, 2017 *NewsChannel5 Nashville*, https://www.newschannel5.com/news/lawsuit-corecivic-staff-ignored-scabies-infection-for-a-full-year; "Man's death hints at wretched medical care in private immigration prisons," November 1, 2016 *The Guardian*, https://www.theguardian.com/us-news/2016/nov/01/jose-jaramillo-private-immigration-prisons-medical-care; A March 10, 2017 report specifically noted that immigrant detainees were placed in the isolation unit (not unlike SCCC's disciplinary segregation) rather than the medical unit, and one of those detainees, like Addison, had a mental health condition. *See* "ICE detainees are asking to be put in solitary confinement for their own safety," March 10, 2017 *The Verge*, https://www.theverge.com/2017/3/10/14873244/ice-immigrant-detention-solitary-trump-corecivic-geo. And as of 2018, CoreCivic was facing multiple lawsuits due to inadequate medical

care at TTCC. *See* "At Tennessee's largest prison, diabetic inmates say they are denied insulin to 'maximize profits'," August 7, 2018 *The Tennessean*, https://www.tennessean.com/story/news/2018/08/07/corecivic-diabetic-inmates-denied-insulin-trousdale-turner/925297002/.

64. The foregoing incidents – and others like them – demonstrate that CoreCivic, its wardens, its senior officers, and its directors adopted and enforced a corporate policy of deliberate indifference to inmate health and safety.

65. The directors and senior officers of CoreCivic knew that inadequate supervision, inadequate medical care, inadequate training, and improper inmate segregation practices were rampant at the company's facilities, and they did not make reasonable efforts to change corporate policies, supervise offending employees, or counteract the threats to inmate safety.

## Claims

### Count 1: Civil Rights Violations

66. All prior paragraphs are incorporated herein by reference.

67. The Plaintiffs bring claims against the CoreCivic entities and all Defendant officers, employees and agents of CoreCivic under 42 U.S.C. §1983 because they violated Joshua Williams's, Chriteris Allen's, and Keith Brown's Eighth Amendment rights to be free from cruel and unusual punishment.

### Count 2: Medical malpractice

68. All prior paragraphs are incorporated herein by reference.

69. Plaintiffs Williams brings claims against the CoreCivic entities and Defendants Rodella, Ivens, and John Doe 1 for medical malpractice leading to the death of Joshua Williams.

70. Plaintiff Kindred brings claims against the CoreCivic entities and Defendants Hardin Medical Center, Wayne D. Murray, and Anthony Ramirez for medical malpractice leading to the terminal illness and suffering of Keith Brown.

**Count 3: Gross Negligence**

71. All prior paragraphs are incorporated herein by reference.

72. Plaintiff Williams bring claims against the CoreCivic entities and Defendants Hininger, Swindle, Medlin, Laughlin, and Perry for gross negligence leading to the death of her son.

73. Plaintiffs Cook and Montgomery bring claims against the CoreCivic entities as well as Defendants Hininger, Swindle, Medlin, Vantell, and John Does 3-7 for gross negligence leading to the death of Chriteris Allen.

**Count 4: Negligence**

74. All prior paragraphs are incorporated herein by reference.

75. Plaintiff Williams bring claims against the CoreCivic entities and Defendants Hininger, Swindle, Medlin, Laughlin, and Perry for negligence leading to the death of her son.

76. Plaintiffs Cook and Montgomery bring claims against the CoreCivic entities as well as Defendants Hininger, Swindle, Medlin, Vantell, and John Does 3-7 for negligence leading to the death of Chriteris Allen.

**Request for Relief**

77. The Plaintiffs respectfully pray that upon a final hearing of this case, judgment be entered for them against the Defendants, for actual and punitive damages together with pre-judgment interest at the maximum rate allowed by law; post-judgment interest at the legal rate; costs of court; attorney fees; and such other and further relief to which the Plaintiffs may be entitled at law or in equity.

**THE PLAINTIFFS DEMAND A JURY TRIAL.**

                                         Respectfully submitted,

                                         **/s/ Janet H. Goode**
                                         Janet H. Goode
Tennessee BPR No. 035872
917 S. Cooper Street
Memphis, Tennessee 38104
(901) 308-7511
(901) 641-3972 (fax)
*janet@janetgoodelaw.com*

Ty Clevenger[1]
Texas Bar No. 24034380
P.O. Box 20753
Brooklyn, New York 11202-0753
(979) 985-5289
(979) 530-9523 (fax)
*tyclevenger@yahoo.com*

**Attorneys for Plaintiffs**

---

[1] Ty Clevenger has not signed this pleading because he has not yet filed his motion to appear pro hac vice. He intends to file the motion after conferring with counsel for the defendants.