# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | |
|---|---|
| **REKIESHA BROWN-PERRY** and **JUSTIN BROWN**, individually and as next of kin for **KEITH BROWN**, | |
| Plaintiffs, | |
| vs. | Case No. _____ |
| **CORECIVIC, INC., CORECIVIC OF TENNESSEE, DAMON T. HININGER, PATRICK SWINDLE, ELAINA RODELLA, KEITH IVENS, HARDIN MEDICAL CENTER, WAYNE D. MURRAY, and ANTHONY RAMIREZ,** | **JURY DEMAND** |
| Defendants | |

## ORIGINAL COMPLAINT

NOW COME Rekiesha Brown-Perry and Justin Brown, the Plaintiffs herein, stating and alleging as follows:

### Introduction

1. The Plaintiffs' claims originally were filed in *Brenda Williams, et al., v. CoreCivic, Inc.*, et al., which is currently pending before this Court as Case No. 3:22-cv-00571. Pursuant to the Court's September 28, 2024 Order Granting Defendants' Joint Motion to Sever Claims (Dkt. #52) in that case, the Plaintiffs now file their claims separately.

### Jurisdiction

2. This Court has jurisdiction under 28 U.S.C. § 1331 because the Plaintiffs assert federal claims under 42 U.S.C. § 1983.

- 1 -

3.   Venue is proper in this Court because some of the Defendants reside or are located in the Middle District of Tennessee, and some of the acts giving rise to this lawsuit occurred in the Middle District of Tennessee.

## Parties

4.   Rekiesha Brown-Perry is the daughter of and a next-of-kin to Keith Brown, an inmate at Hardin County Correctional Facility ("HCCF"). HCCF is located in Hardin County, Tennessee, and is owned and operated by Defendant CoreCivic, Inc. and Defendant CoreCivic of Tennessee, LLC. Ms. Brown-Perry asserts claims individually and as survivor and next-of-kin to Keith Brown.

5.   Justin Brown is the son of and a next-of-kin to Keith Brown, an inmate at Hardin County Correctional Facility ("HCCF"). Mr. Brown asserts claims individually and as survivor and next-of-kin to Keith Brown.

6.   CoreCivic, Inc. is a private prison company that is headquartered in Nashville, Tennessee.

7.   CoreCivic of Tennessee, LLC is a wholly-owned subsidiary of CoreCivic, Inc., and it operates all of the CoreCivic facilities in Tennessee. CoreCivic, Inc. and CoreCivic of Tennessee, LLC are hereinafter referred to jointly as "CoreCivic" or "Defendant CoreCivic."

8.   Damon Hininger is the chief executive officer of Defendant CoreCivic, Inc.

9.   Patrick Swindle is the chief operating officer of Defendant CoreCivic, Inc.

10. Elaina Rodella, M.D. is CoreCivic's regional medical director for the area that includes HCCF.

11. Keith Ivens, M.D. is the medical director for CoreCivic.

12. Hardin Medical Center is a medical center and hospital in Savannah, Tennessee.

13. Wayne D. Murray, M.D. is an emergency physician at Hardin Medical Center.

14. Anthony Ramirez, M.D. is an emergency physician at Hardin Medical Center.

- 2 -

**Facts**

15. Keith Brown was an inmate at HCCF in late 2020 when he began experiencing severe abdominal pain. On August 23, 2020, he was transferred to Hardin Medical Center, where Defendant Murray ordered a CT scan. According to medical records obtained on December 2, 2021, Defendant Murray observed a "tiny cyst" on Keith's liver, but he did not evaluate the "cyst" further. If he had, then he would have discovered a cancerous lesion.

16. Keith was sent to Hardin Medical Center again on February 6, 2021, as a result of severe, ongoing abdominal pain. Defendant Ramirez ordered an X-ray and blood tests, and Dr. Benjamin Wilkerson (a radiologist) and Defendant Ramirez interpreted the X-ray results. According to records obtained on December 12, 2021, both physicians found nothing abnormal in the X-rays, and Defendant Ramirez diagnosed Keith with stomach ulcers caused by an H. Pylori infection. Defendant Ramirez had access to Keith's medical records, which clearly indicated (1) that Keith had been suffering from abdominal pain for months and (2) that he had a "cyst" on his liver. Given the information already at his disposal, Defendant Ramirez failed to undertake reasonable steps to determine the source of Keith's illness. The delay in treatment allowed Keith's cancer to spread and become terminal.

17. In the months that followed, Keith continued to suffer from the same symptoms that he first reported in late 2020. Keith observed blood in his stool, and he began losing weight. While he was still incarcerated at HCCF, Defendant Rodela ordered additional blood tests and, based on the results, insisted that Keith was still suffering from the H. Pylori infection. Keith had no medical training, and he took Dr. Rodela at her word.

- 3 -

18. Despite seeing Keith's medical chart and his ongoing symptoms, Dr. Rodella never ordered a CAT scan nor any other form of imaging scan or further diagnostic testing.

19. Defendant Rodella has a history of deliberate indifference toward the inmates in CoreCivic's facilities. In particular, she fails to refer them for outside treatment despite the fact that CoreCivic's facilities are not equipped to provide the specialized care that is required. The Plaintiffs request that the Court take judicial notice of *Robert Owen Smith v. Elaina Rodela, et al.*, (M.D. Tenn., July 27, 2022, No. 1:22-CV-00023) 2022 WL 2975297, where the plaintiff was denied treatment for his skin cancer – after it was already diagnosed – until the cancer had spread and required major surgery. Likewise, in *Stephen R. Mayes v. Dr. Elaine Rodella, et al.*, (M.D. Tenn., January 8, 2021, No. 1:20-cv-00057), Defendant Rodella and Defendant Ivens failed to refer an inmate with a life-threatening heart condition to a facility capable of treating him. And in *James Lambert v. CoreCivic, Inc., et al*., Case No. 1:21-CV-00053 (M.D. Tenn.), Defendant Rodella failed to seek outside care for an inmate suffering from serious liver diseases.

20. In order to save costs and increase profits, Defendants Rodella and Ivens have developed a policy of denying outside medical care to inmates, even when CoreCivic lacks the capacity to treat the illness in question. Given the litigation against CoreCivic, the Plaintiffs allege that Defendant Hininger, Defendant Swindle, and the company directors are aware of the practice and have ratified it.

21. On October 12, 2021, Keith passed out from the increasing pain in his abdomen. At Defendant Rodella's direction, CoreCivic medical staff gave him pain medication and sent him back to his cell. Keith passed out again on or about October 16, 2021, and at Defendant Rodella's direction he was kept in CoreCivic's medical ward all day despite the fact that he was vomiting almost constantly. As usual, Defendant Rodella was trying to avoid an outside referral in order to

- 4 -

save money for CoreCivic. Finally, Keith was sent back to Hardin Medical Center, where a CAT scan revealed a large mass in his abdomen.

22. On the same day, Keith was transferred to Jackson-Madison County General Hospital. At the Jackson hospital, Keith was sent into emergency surgery where his doctors discovered a large cancerous mass in his colon. After the surgery, Keith was diagnosed with terminal Stage 4 colon cancer.

23. Given the seriousness of Keith's medical condition, he should have been sent directly to the Tennessee Department of Correction's ("TDOC") Lois M. DeBerry Special Needs Facility, which is designed to house inmates with complex medical problems. Instead, Keith was sent back to HCCF (despite the fact that it did not have the facilities necessary to care for someone in Keith's medical condition). HCCF's medical unit was understaffed, Keith did not receive the level of care required for his condition, and he became dehydrated from constant vomiting. Finally, on November 17, 2021, Keith was transferred to Lois M. DeBerry.

24. Had Keith been properly evaluated at Hardin County Medical Center, Defendants Murray and Gonzales would have discovered the cancerous mass in Keith's abdomen. Likewise, had Defendant Rodella properly evaluated Keith after his trip to Hardin Medical Center, his cancer would have been discovered and it could have been treated. As a result of the needless delays in treating Keith, his cancer progressed to the point where it became terminal. Furthermore, Keith suffered extraordinary pain that could have been alleviated with timely treatment. Finally, he suffered needless pain because HCCF failed to initiate a timely transfer to Lois M. DeBerry.

25. On July 11, 2023, Keith died from cancer.

**A pattern and practice of deliberate indifference to inmate health and safety.**

26. Keith's death is part of a pattern.

- 5 -

27. In the years preceding Keith's death, Defendant CoreCivic paid millions in settlements around the United States as a result of allegations that (1) it routinely understaffed its correctional facilities, inevitably resulting in anarchy, assault, murder, and suicide; and (2) it routinely failed to provide adequate medical and mental health care to inmates.

28. In 2016, CoreCivic and its directors were sued by company shareholders who alleged that the company misrepresented its pattern of understaffing and poor medical care, which ultimately led the Federal Bureau of Prisons to cancel its business relationship with CoreCivic. In April of 2021, the company settled the case for $56 million.

29. Notwithstanding the shareholder lawsuit and numerous other warnings, CoreCivic continues to provide inadequate staffing, supervision and medical care at its facilities, including HCCF. Under the leadership of Defendant Heninger, CoreCivic has an established history of putting profits ahead of the health and safety of inmates.

30. According to a 2011 lawsuit filed by the American Civil Liberties Union, inmates referred to CoreCivic's Idaho Correctional Center as "Gladiator School" because the understaffing led to such a violent atmosphere at the prison. CoreCivic settled the lawsuit with the ACLU, agreeing to provide minimum staff levels, but the company was held in contempt of court in 2013 because it violated the agreement and falsified records to misrepresent the number of guards on duty. In 2014, the FBI opened an investigation of the company based on its billing for "ghost employees," Idaho Governor Butch Otter ordered state officials to take control of the prison, and the company paid the state $1 million for understaffing the prison.

31. On or about February 23, 2017, a federal jury found that CoreCivic had violated inmates' Eighth Amendment rights to be free from cruel and unusual punishment by being deliberately indifferent to the serious risk posed by the company's long-standing practice of understaffing the

- 6 -

Idaho Correctional Center. The jury did not award damages, however, because it found that the inmates' particular injuries were caused by other factors.

32. At an Oklahoma prison operated by CoreCivic, ten prisoners were involved in a fight on February 25, 2015, that left five with stab wounds. The following month, eight more inmates were involved in another stabbing incident. In June of that year, thirty-three gang members fought with weapons and eleven prisoners were sent to a hospital. On September 12, 2015, four inmates were killed during a riot at the same facility. Inmates alleged that gangs were effectively allowed to run the prison. According to an investigation by the Oklahoma Department of Corrections, video evidence of the September 12, 2015 incident from three cameras at the facility was recorded over or deleted by CoreCivic employees. Two guards were later indicted for bringing drugs and other contraband into the prison, including one of the guards accused of failing to act during the riot. Between 2012 and 2016, one-third of all homicides in Oklahoma prisons occurred at two CoreCivic facilities, though they held just over 10 percent of the state's prison population.

33. In August of 2016, the Office of the Inspector General ("OIG") of the U.S. Department of Justice found widespread deficiencies in staffing and medical care at facilities operated for the federal Bureau of Prisons by private contractors, including those operated by CoreCivic. As a result, the Department of Justice indicated that it would phase out its relationships with private prisons. That, in turn, led to the shareholder lawsuit described above. In a separate report released on April 25, 2017, OIG found widespread understaffing at a detention facility in Leavenworth, Kansas operated by CoreCivic for the U.S. Marshals Service, with vacancy levels reaching as high as 23 percent between 2014 and 2015.

- 7 -

34. Earlier, the company tried to hide the fact that it was packing three inmates into two-inmate cells at Leavenworth, contrary to prison regulations. The following excerpt appears in the April 25, 2017 OIG report:

> In 2011, without the knowledge of the [U.S. Marshals Service], the [Leavenworth Detention Center or "LDC"] took steps to conceal its practice of triple bunking detainees. LDC staff uninstalled the third beds bolted to the floor of several cells designed for two detainees and removed the beds from the facility in advance of a 2011 American Correctional Association (ACA) accreditation audit. A subsequent CoreCivic internal investigation revealed that this may have also occurred during other ACA audits of the LDC.

35. The excerpt in the previous paragraph is true.

36. The Plaintiffs adopt the foregoing excerpt as if alleged herein.

37. In May of 2012, a riot at a federal prison operated by CoreCivic in Natchez, Mississippi resulted in the death of a guard and injuries to approximately 20 inmates and prison staff. OIG investigated and alleged the following in a report released in December of 2016:

> The riot, according to a Federal Bureau of Investigation (FBI) affidavit, was a consequence of what inmates perceived to be inadequate medical care, substandard food, and disrespectful staff members. A BOP after-action report found deficiencies in staffing levels, staff experience, communication between staff and inmates, and CoreCivic's intelligence systems. The report specifically cited the lack of Spanish-speaking staff and staff inexperience.
>
> Four years after the riot, we were deeply concerned to find that the facility was plagued by the same significant deficiencies in correctional and health services and Spanish-speaking staffing. In 19 of the 38 months following the riot, we found CoreCivic staffed correctional services at an even lower level than at the time of the riot in terms of actual post coverage. Yet CoreCivic's monthly reports to the BOP, which were based on simple headcounts, showed that correctional staffing levels had improved in 36 of those 38 months.

38. The excerpt in the previous paragraph is true.

39. The Plaintiffs adopt the foregoing excerpt as if alleged herein.

40. A state audit released in 2017 found that Whiteville Correctional Facility ("WCF") (operated by CoreCivic) in Whiteville, Tennessee needed 79 officers to cover 17 positions during

- 8 -

a shift, but on average the facility provided only 57 officers per shift. The same audit found systemic problems at HCCC, including understaffing and gang violence. The audit further noted that information provided by CoreCivic concerning HCCC and another facility was so incomplete that it was not possible to determine the accuracy of staffing levels.

41. The audit findings in the previous paragraph were true.

42. The Plaintiffs adopt the foregoing audit findings and allege that CoreCivic deliberately provided incomplete information in order to disguise the fact that it was understaffing both facilities.

43. On December 12, 2017, a former guard at Trousdale-Turner Correctional Facility (operated by CoreCivic) in Hartsville, Tennessee testified before a legislative committee that she resigned from the company in September after witnessing two inmates die from medical neglect during the seven months that she worked for the company. Ashley Dixon told lawmakers that in one instance she pleaded with her superiors for three days to help a dying inmate, but to no avail, and her subsequent complaints were ignored by company officials.

44. Ms. Dixon's testimony was true.

45. A scathing audit released by the Tennessee Comptroller on January 10, 2020 found that CoreCivic had not properly recorded information about accidents, illnesses, and traumatic injuries at three of its facilities in Tennessee, including HCCF and WCF. The same audit found that WCF was missing nearly one-third of its medical and mental health personnel during two different audit periods and that homicides were two times more likely in CoreCivic facilities than in state-operated facilities.

46. The audit findings in the previous paragraph were true.

- 9 -

47. The Plaintiffs have attached a copy of the original complaint from *G. Marie Newby vs. CoreCivc of Tennessee, LLC, et al*., which is pending before this Court as Case No. 3:22-cv-00093 as Exhibit 1. The Plaintiffs incorporate that complaint as well as its exhibits (Dkt. #s 1-1 through 1-8) by reference as if fully set forth therein. Paragraphs 1-10 the *Newby* complaint show that Defendant CoreCivic systematically disregarded inmate safety for the purpose of increasing profits. Paragraphs 32, 58, 69-71, 75-76, 84, and 86-87 set forth how Defendant Hininger was fully aware of Defendant CoreCivic's practice of putting profits ahead of inmate safety. Defendant Hininger further was aware of Defendant CoreCivic's policy of deliberate difference toward inmates' medical needs based on widespread media reports of inadequate medical care at the company's facilities. *See, e.g.,* "Mexican man's widow sues over Otay Mesa jail death, says pleas for help ignored," March 23, 2017, *The San Diego Union-Tribune*, https://www.sandiegouniontribune.com/news/courts/sd-me-detention-lawsuit-20170323-story.html; "Lawsuit: CoreCivic Staff Ignored Scabies Infection For A Full Year," July 31, 2017, *NewsChannel5 Nashville*, https://www.newschannel5.com/news/lawsuit-corecivic-staff-ignored-scabies-infection-for-a-full-year; "Man's death hints at wretched medical care in private immigration prisons," November 1, 2016, *The Guardian*, https://www.theguardian.com/us-news/2016/nov/01/jose-jaramillo-private-immigration-prisons-medical-care; A March 10, 2017 report specifically noted that immigrant detainees were placed in the isolation unit (not unlike SCCC's disciplinary segregation) rather than the medical unit, and one of those detainees had a mental health condition. *See* "ICE detainees are asking to be put in solitary confinement for their own safety," March 10, 2017, *The Verge*, https://www.theverge.com/2017/3/10/14873244/ice-immigrant-detention-solitary-trump-corecivic-geo. And as of 2018, CoreCivic was facing multiple lawsuits due to inadequate medical care at TTCC. *See* "At Tennessee's largest prison,

- 10 -

diabetic inmates say they are denied insulin to 'maximize profits'," August 7, 2018, *The Tennessean*, https://www.tennessean.com/story/news/2018/08/07/corecivic-diabetic-inmates-denied-insulin-trousdale-turner/925297002/.

48. The foregoing incidents – and others like them – demonstrate that CoreCivic, its wardens, its senior officers, and its directors adopted and enforced a corporate policy of deliberate indifference to inmate health and safety. Specifically, Defendants Hininger, and Swindle were aware of inadequate guard staffing and inadequate medical care throughout CoreCivic's facilities, and they were deliberately indifferent to those problems.

49. The directors and senior officers of CoreCivic knew that inadequate supervision, inadequate medical care, inadequate training, and improper inmate segregation practices were rampant at the company's facilities, and they did not make reasonable efforts to change corporate policies, supervise offending employees, or counteract the threats to inmate safety.

## Claims

## Count 1: Civil Rights Violations

50.     All prior paragraphs are incorporated herein by reference.

51.     The Plaintiffs bring claims against the CoreCivic entities and Defendants Hininger, Swindle, Medlin, Rodella, and Ivens under 42 U.S.C. §1983 for Eighth Amendment violations, namely deliberate indifference to the health and safety of Keith Brown.

## Count 2: Medical malpractice

52.     All prior paragraphs are incorporated herein by reference.

53.     The Plaintiffs bring claims against the CoreCivic entities and Defendants Rodella, Ivens, Hardin Medical Center, Wayne D. Murray, and Anthony Ramirez for medical malpractice leading to the terminal illness and suffering of Keith Brown.

- 11 -

**Count 3: Gross Negligence**

54.     All prior paragraphs are incorporated herein by reference.

55.     The Plaintiffs bring claims against the CoreCivic entities and Defendants Hininger, Swindle, and Medlin for gross negligence.

**Count 4: Negligence**

56.     All prior paragraphs are incorporated herein by reference.

57.     The Plaintiffs bring claims against the CoreCivic entities and Defendants Hininger, Swindle, and Medlin for negligence.

## Request for Relief

58.     The Plaintiffs respectfully pray that upon a final hearing of this case, judgment be entered for them against the Defendants, for actual and punitive damages together with pre-judgment interest at the maximum rate allowed by law; post-judgment interest at the legal rate; costs of court; attorneys fees; and such other and further relief to which the Plaintiffs may be entitled at law or in equity.

**THE PLAINTIFFS DEMAND A JURY TRIAL.**

Respectfully submitted,

**/s/ Janet H. Goode**
Janet H. Goode
Tennessee BPR No. 035872
917 S. Cooper Street
Memphis, Tennessee 38104
(901) 308-7511
(901) 641-3972 (fax)
*janet@janetgoodelaw.com*

**/s/ Ty Clevenger**
Ty Clevenger, *pro hac vice*
Texas Bar No. 24034380
212 S. Oxford Street #7D
Brooklyn, New York 11217
(979) 985-5289
(979) 530-9523 (fax)
*tyclevenger@yahoo.com*

**Attorneys for Plaintiffs**

- 13 -

Exhibit 1

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### AT NASHVILLE

| | | |
|---|---|---|
| G. MARIE NEWBY, individually, and as Administratrix of THE ESTATE OF TERRY CHILDRESS, | § § § § | |
| *Plaintiffs*, | § § | Case No. _____ |
| v. | § § | JURY DEMANDED |
| CORECIVIC OF TENNESSEE, LLC, as owner and operator of TROUSDALE TURNER CORRECTIONAL CENTER, DAMON HININGER, STEVE CONRY, RAYMOND BYRD, and SHAWNA CURTIS, | § § § § § § § § | |
| *Defendants*. | § § | |

## COMPLAINT

For their Complaint, the Plaintiffs state to the Court and the Jury as follows:

## I. INTRODUCTION

1.     This action arises from yet another preventable death at CoreCivic's "severely understaffed" Trousdale Turner Correctional Center[1]—Tennessee's most dangerous and notorious prison.

2.     According to one of its own former employees, CoreCivic—a private prison corporation that operates Trousdale Turner Correctional Center for profit—is driven by "the power of the almighty dollar."[2] As a result, CoreCivic severely understaffs Trousdale

---

[1] *See* **Ex. 1,** Tr. of Treyton Lattimore Interview at 31:1.

[2] *Id.* at 33:19.

Turner Correctional Center while willfully disregarding inmate safety there. CoreCivic is also willing to tolerate preventable deaths at Trousdale Turner Correctional Center because adequately staffing the facility would exceed the cost of liability that CoreCivic faces when inmates die from CoreCivic's profit-motivated deliberate indifference.

3. In addition to being made aware of—and asked to adjudicate—claims arising from CoreCivic's chronic deliberate indifference to inmate safety at Trousdale Tuner Correctional Center specifically,[3] this Court has been made aware of "inadequate medical staffing that was endemic of broader issues with staffing levels at CoreCivic facilities" generally, it has been made aware of CoreCivic's "failures to maintain accurate records of medication administrations," and it has been made aware of at least one "inadequate emergency response in the case of an inmate who eventually died."[4] This Court is also privy to sealed communications among CoreCivic's executives and lobbyists that confirm CoreCivic's chronic, profit-motivated deliberate indifference to inmate safety.[5]

4. Among the results that CoreCivic has achieved through its profit-motivated deliberate indifference to inmate health and safety, Tennessee inmates who are housed at CoreCivic facilities are approximately twice as likely to die and more than four times as likely to be murdered—even though CoreCivic houses inmates with disproportionately low security designations.[6]

---

[3] *See, e.g.,* **Ex. 2**, First Amended Complaint, Pleasant-Bey v. State of Tennessee et al. No. 3:19-CV-486 (MDTN Dec. 21, 2020), ECF No. 68 at 9–15, 17.

[4] *See, e.g.,* **Ex. 3**, Memorandum, Grae v. Corrections Corporation of America, No. 3:16-cv-02267 (MDTN March 26, 2019), ECF No. 165.

[5] *See id.* at 7, n. 2.

[6] *See, e.g.,* Cassandra Stephenson, *Inmate death ruled homicide in a Tennessee CoreCivic prison where rate is twice as high as TDOC's, records show,* JACKSON SUN (Jan. 28, 2020),

5.     A scathing Performance Audit Report of Tennessee's CoreCivic facilities conducted by the Tennessee Comptroller of the Treasury recently determined that CoreCivic's management failed to "implement or enforce established internal controls to ensure state and CoreCivic correctional facilities staff collected and accurately reported incident information" regarding "inmate deaths, inmate assaults, inmate violence, correction officers' use of force, and inmate accidents and injuries," and it found that in many instances, CoreCivic had destroyed records and evidence in contravention of state law.[7]

6.     Shortly before that, another state audit determined that Trousdale Turner Correctional Center, in particular, "operated with fewer than approved correctional staff, did not have all staffing rosters, did not follow staffing pattern guidelines, and left critical posts unstaffed"; that "CoreCivic staffing reports at Trousdale Turner Correctional Center contained numerous errors"; and that "Trousdale Turner Correctional Center management's noncompliance with contractual requirements and department policies relating to inmate services challenged the department's ability to effectively monitor the correctional facility."[8]

---

https://www.jacksonsun.com/story/news/crime/2020/01/28/corecivics-tennessee-prisons-have-twice-homicide-rate-tdocs/2776928001/ ("The corporation's four Tennessee facilities hold roughly 35% of the state's prison population but accounted for about 63% of the state's prison homicides."); Prison Legal News, *CoreCivic Prisons in Tennessee Have Twice as Many Murders, Four Times the Homicide Rate as State-Run Facilities*, PLN (Aug. 6, 2019), https://www.prisonlegalnews.org/news/2019/aug/6/corecivic-prisons-tennessee-have-twice-many-murders-four-times-homicide-rate-state-run-facilities/ ("from 2014 through June 2019, there were twice as many murders in the four Tennessee prisons operated by CoreCivic (formerly Corrections Corporation of America) than in the 10 prisons run by the Tennessee Department of Correction (TDOC). Also, the homicide rate in CoreCivic facilities was over four times higher than the rate for TDOC prisons.").

[7] **Ex. 4,** Tennessee Comptroller of the Treasury, Performance Audit Report, Tennessee Department of Correction (Jan. 2020), *available at* https://comptroller.tn.gov/content/dam/cot/sa/advanced-search/2020/pa19032.pdf.

7. In addition to unlawfully failing to collect—and in many instances destroying—records and evidence bearing upon its potential liability, CoreCivic has recently been caught *fabricating* evidence in an effort to evade legal liability.[9]

8. The reality that CoreCivic chronically fails to comply with its legal obligations and is willing to conceal, destroy, or fabricate evidence that would expose its deliberate, profit-motivated indifference to inmate safety are not new revelations. Indeed, the State of Tennessee itself has all but stated directly that CoreCivic—and Trousdale Turner Correctional Center in particular—extensively engages in such behavior. In the Tennessee Comptroller's January 2020 Performance Audit Report, for example, the Comptroller specifically found that "health services staff had not entered any serious accidents or injuries on the Accidents screen in TOMIS" at Trousdale Turner Correctional Center during *a one-and-a-half-year audit period*—something auditors found to be "questionable given the nature of the correctional environment" and determined was "unlikely" to be accurate. Trousdale Turner Correctional Center officials ultimately acknowledged that their incident reporting was, in fact, inaccurate, claiming not to have been "aware" of applicable state reporting requirements.

9. The data that ultimately was reported to regulators reflected that Trousdale Turner Correctional Center experienced the highest number of Class A incidents—defined as "life-threatening matters and breaches of security that are likely to cause serious operational problems," including "escapes and attempted escapes, deaths, assaults,

---

[8] **Ex. 5,** Tennessee Comptroller of the Treasury, Performance Audit Report, Tennessee Department of Correction (Nov. 2017), *available at* https://comptroller.tn.gov/content/dam/cot/sa/advanced-search/2017/pa17275.pdf.

[9] *See, e.g.,* Brinley Hineman, *After Tennessee prison suicide, CoreCivic counselor fabricated health records of treatment: TDOC,* THE TENNESSEAN (Aug. 25, 2020), https://www.tennessean.com/story/news/crime/2020/08/26/after-tennessee-prisoners-suicide-corecivic-worker-faked-health-records/3404186001/.

hostage situations, total institutional lockdowns, rapes, certain uses of force, and various weapons"—of any facility audited in the entire State of Tennessee. CoreCivic also managed to achieve that extraordinary result despite the fact that "CoreCivic correctional facilities staff did not appropriately maintain original documentation of Class A incidents." The following graph, appended to the Comptroller's 2020 report as Appendix-B-2, summarizes reported Class A incidents by each audited facility from October 1, 2017 through April 12, 2019:



**Appendix B-2**
**Summary of Class A Incidents (Those Involving Serious Risk to the Facility or Community) Reported by Location**
**October 1, 2017, Through April 12, 2019**

Source: Tennessee Offender Management Information System.

10. Despite all of the foregoing; despite multiple additional preventable deaths at Trousdale Turner Correctional Center since the aforementioned audits and even since Mr. Childress's death in this case occurred; and despite near-constant reports of brutality, criminality, neglect, and death both at CoreCivic's Tennessee facilities generally and at

Trousdale Turner Correctional Center in particular year after year after year;[10] state

---

[10] *See* Demetria Kalodimos, *Woman says she paid off gangs to keep son safe in prison*, WSMV (Oct. 5, 2017), https://www.wsmv.com/news/woman-says-she-paid-off-gangs-to-keep-son-safe-in-prison/article_a4e670ea-78be-5087-86e5-a65ecd485475.html; Joseph Wenzel, *Over 1,200 staff, inmates test positive for COVID-19 at Trousdale Turner Correctional Center*, WSMV (May 1, 2020), https://www.wsmv.com/news/over-1-200-staff-inmates-test-positive-for-covid-19-at-trousdale-turner-correctional-center/article_568c03d2-8bde-11ea-a447-4b7eaabeb67b.html; Adam Tamburin, *Tennessee prison inmate dies after fight at Trousdale Turner*, THE TENNESSEAN (Jan. 26, 2020), https://www.tennessean.com/story/news/2020/01/26/tennessee-prison-inmate-dies-after-fight-trousdale-turner-correctional-center/4581013002/; Dave Boucher, *New Tennessee CCA prison stops taking inmates amid 'serious issues,'* THE TENNESSEAN (May 24, 2016), https://www.tennessean.com/story/news/politics/2016/05/24/new-tennessee-private-prison-stops-taking-inmates/84867834/; Chris Conte, *Prisons for profit: Concerns mount about Trousdale Turner Correctional Center, operator CoreCivic*, WTVF (Jun. 13, 2019), https://www.newschannel5.com/longform/prisons-for-profit-concerns-mount-about-trousdale-turner-correctional-center-operator-corecivic; Staff Report, *Scathing state audit slams Tennessee prisons, CoreCivic for staffing, sexual assaults, and deaths in jails*, WTVF (Jan. 10, 2020), https://www.newschannel5.com/news/scathing-state-audit-slams-tennessee-prisons-corecivic-for-staffing-sexual-assaults-and-deaths-in-jails; Jamie McGee, *CoreCivic shareholders granted class action status in fraud lawsuit*, THE TENNESSEAN (May 27, 2019), https://www.tennessean.com/story/money/2019/03/27/corecivic-class-action-securities-fraud-lawsuit/3289913002/; Chris Gregory, *Family seeks answers in loved one's death at Trousdale prison*, LEBANON DEMOCRAT (Jan. 2, 2021), https://www.lebanondemocrat.com/hartsville/family-seeks-answers-in-loved-ones-death-at-trousdale-prison/article_1ffe90f7-0e9f-5021-bb94-9ec1b4d23139.html; Demetria Kalodimos, *Inmates at CoreCivic prisons say they sometimes go months without medical care*, WSMV (Jun. 22, 2017), https://www.wsmv.com/news/inmates-at-corecivic-prisons-say-they-sometimes-go-months-without-medical-care/article_8d28e630-bd12-5f1c-8b68-92b9336553e1.html; Prison Legal News, *Incorrect Cause of Tennessee Prisoner's Death Reported by CoreCivic Employees*, PLN (Jun. 7, 2018), https://www.prisonlegalnews.org/news/2018/jun/7/incorrect-cause-tennessee-prisoners-death-reported-corecivic-employees/; Staff Report, *Private prison company CoreCivic's history of problems in Tennessee*, THE TENNESSEAN (Jan. 16, 2020), https://www.tennessean.com/story/news/local/2020/01/17/private-prison-corecivic-history-problems-tennessee/4470277002/; Stephen Elliott, *State audit criticizes CoreCivic facilities*, THE NASHVILLE POST (Nov. 14, 2017), https://www.nashvillepost.com/business/prison-management/article/20982796/state-audit-criticizes-corecivic-facilities; Matt Blois, *CoreCivic reports $25M in profits as COVID infects 2,500+ inmates*, THE NASHVILLE POST (Jun. 30, 2020), https://www.nashvillepost.com/business/prison-management/article/21138792/corecivic-reports-25m-in-profits-as-covid-infects-2500-inmates; Steven Hale, *Problems Persist at Tennessee's Mismanaged Prisons*, THE NASHVILLE SCENE (Jan. 22, 2020), https://www.nashvillescene.com/news/features/article/21111586/problems-persist-at-tennessees-mismanaged-prisons; Dave Boucher, *CoreCivic investigating ex-officer's allegations of negligent deaths at private prison*, THE TENNESSEAN (Dec. 12, 2017), https://www.tennessean.com/story/news/2017/12/12/corecivic-investigating-ex-officers-allegations-negligent-deaths-private-prison/946196001/; Elizabeth Weill-Greenberg, '*Just Let Him Kick*,' THE APPEAL (Sep. 6, 2018), https://theappeal.org/just-let-him-kick/; Brinley Hineman, *Murfreesboro man charged in prison cellmate's death at Trousdale*, DAILY NEWS JOURNAL (Feb. 20, 2020), https://www.dnj.com/story/news/2020/02/20/murfreesboro-man-jacob-kado-charged-death-prison-cell-mate-ernest-hill-trousdale-turner/4818354002/; Ethan Illers, *Man killed during inmate-on-inmate altercation at Trousdale Turner prison*, WSMV (Jun. 16, 2019), https://www.wsmv.com/news/man-killed-during-inmate-on-inmate-altercation-at-trousdale-turner-prison/article_8d8b6806-9066-11e9-b749-7b44cac1c002.html; Jeremy Finley, *Recorded conversations reveal life inside prison ravaged by COVID-19*, WSMV (May 6, 2020), https://www.wsmv.com/news/investigations/recorded-conversations-reveal-life-inside-prison-ravaged-by-covid-19/article_91ef5b06-8fe2-11ea-9b75-f36db06e1ab1.html; Demetria Kalodimos, *Gang activity, security a concern at Trousdale Turner facility*, WSMV (Jun. 21, 2017), https://www.wsmv.com/news/gang-activity-security-a-concern-at-trousdale-turner-

regulators have failed to curb Trousdale Turner Correctional Center's worst abuses. Instead, in May of 2021—approximately 10 weeks after multiple murders at Trousdale Turner Correctional Center including the murder at issue in this Complaint occurred—the Trousdale County Commission approved a new, five-year contract with CoreCivic to operate Trousdale Turner Correctional Center.

11. To date, this Court, too, has been unable to remedy CoreCivic's operation of a chronically unsafe prison within the Middle District of Tennessee where inmates in CoreCivic's care die or incur serious bodily injury with enraging frequency.

facility/article_df82a358-7073-552e-b5e4-9feb2e9cf8bc.html; Steven Hale, *Tennessee's Largest Prison Still Appears as Troubled as Ever*, THE NASHVILLE SCENE (Feb. 13, 2019), https://www.nashvillescene.com/news/features/article/21047078/tennessees-largest-prison-still-appears-as-troubled-as-ever; Jessie Williams, *Trousdale Turner Corrections Officer Arrested*, MACON COUNTY CHRONICLE (Feb. 5, 2019), https://www.maconcountychronicle.com/news/5680-trousdale-turner-corrections-officer-arrested; Brett Kelman, *At Tennessee's largest prison, diabetic inmates say they are denied insulin to 'maximize profits'*, THE TENNESSEAN (Aug. 7, 2018), https://www.tennessean.com/story/news/2018/08/07/corecivic-diabetic-inmates-denied-insulin-trousdale-turner/925297002/; Natalie Allison, *Lawmakers hear from prison rape survivor, parents of man who hanged himself in CoreCivic facility*, THE TENNESSEAN (Dec. 19, 2018), https://www.tennessean.com/story/news/politics/2018/12/19/tennessee-legislators-hear-rape-suicide-corecivic-prison/2355556002/; Dave Boucher, *Private prison chief: 'We've got work to do' at Trousdale facility*, THE TENNESSEAN (Dec. 13, 2016), https://www.tennessean.com/story/news/2016/12/13/private-prison-chief-weve-got-work-do-trousdale-facility/95223230/; Demetria Kalodimos, *Former chaplain describes conditions inside TN prison*, WSMV (Jun. 19, 2017), https://www.wsmv.com/news/former-chaplain-describes-conditions-inside-tn-prison/article_9b30af82-8297-5101-b11f-b5fd9270bf18.html; Chris Gregory, *Trousdale Turner employee charged with smuggling contraband*, LEBANON DEMOCRAT (Apr. 23, 2020), https://www.lebanondemocrat.com/hartsville/trousdale-turner-employee-charged-with-smuggling-contraband/article_6b865daf-fbc8-5a59-9a35-e84b61ace2e4.html; Andy Cordan, *Prison corrections officer in Trousdale County arrested carrying drugs*, WKRN (Jan. 20, 2021), https://www.wkrn.com/news/prison-corrections-officer-in-trousdale-county-arrested-carrying-drugs/; Dave Boucher, *Gangs, insufficient staffing plague troubled Tennessee private prison, state audit finds*, THE TENNESSEAN (Nov. 14, 2017), https://www.tennessean.com/story/news/politics/2017/11/14/tennessee-private-prison-operated-by-corecivic-blasted-ongoing-problems-new-state-audit/858884001/; Keith Sharon and Adam Tamburin, *'This is unreal': Family seeks answers in death of Trousdale Turner prison inmate*, THE TENNESSEAN (Feb. 2, 2021), https://www.tennessean.com/story/news/2021/02/03/trousdale-turner-inmate-aaron-blayke-adams-dead-family-wants-answers/4290646001/; Alex Corradetti, *Investigation underway following death of inmate at Trousdale Turner Correctional Center*, WKRN (Sep. 8, 2021), https://www.wkrn.com/news/investigation-underway-following-death-of-inmate-at-trousdale-turner-correctional-center/; Chris Gregory, *Former Trousdale Turner corrections officer indicted*, LEBANON DEMOCRAT (Oct. 7, 2021), https://www.lebanondemocrat.com/hartsville/former-trousdale-turner-corrections-officer-indicted/article_aac20d8d-16e5-5edc-9e7e-d5fd9f8bfd0e.html; Levi Ismail, *NAACP calls for closure of Trousdale Turner Correctional Center, cites 'barbaric treatment' of Black men*, WTVF (Nov. 11, 2021), https://www.newschannel5.com/news/naacp-calls-for-closure-of-trousdale-turner-correctional-center-cites-barbaric-treatment-of-black-men (all attached as Collective **Ex. 6**).

12.     With each additional preventable death that occurs at Trousdale Turner Correctional Center that is not met with meaningful regulatory action, CoreCivic is emboldened by the knowledge that it may continue to act with deliberate indifference toward inmate safety and allow inmates to die needlessly in its care without fear of experiencing meaningful legal consequences.

13.     This Complaint—filed by the mother of decedent Terry Childress, who was brutally assaulted and needlessly died at Trousdale Turner Correctional Center in February 2021—demands that this Court compensate the Plaintiffs for Mr. Childress's preventable death; order CoreCivic to disgorge all profits arising from its chronically unconstitutional operation of Trousdale Turner Correctional Center; assess a punitive monetary sanction against CoreCivic sufficient to deter CoreCivic from maintaining its profit-motivated deliberate indifference to inmate safety; declare Trousdale Turner Correctional Center to be acting illegally and unconstitutionally; and appoint an independent monitor to audit and ensure Trousdale Turner Correctional Center's compliance with minimum constitutional obligations.  Alternatively, this Court should enjoin Trousdale Turner Correctional Center's continued operation going forward.

## II.  PARTIES

14.     Plaintiff G. Marie Newby is the mother of decedent Terry Childress, the personal representative of Mr. Childress's estate, and Mr. Childress's next-of-kin.  Ms. Newby is a citizen of Alabama and may be contacted through her counsel.

15.     Plaintiff the Estate of Terry Childress is the estate of decedent Terry Childress.  At all times relevant to this Complaint, Mr. Childress resided at CoreCivic's Trousdale Turner Correctional Facility in Trousdale County, Tennessee, where he was brutally murdered by his cellmate just a day after appearing for a parole hearing.  The

-8-

Estate of Terry Childress is represented by its personal representative, Ms. Newby, and it may be contacted through its counsel.

16.     Defendant CoreCivic of Tennessee, LLC—which went by the name "Corrections Corporation of America" before that name became synonymous with the most insidious aspects of America's private prison industry—is a private, for-profit prison corporation that cages human beings for money. CoreCivic owns and operates Trousdale Turner Correctional Center, the private prison that enabled Mr. Childress's preventable death through customs and policies of understaffing, misclassification, and profit-motivated deliberate indifference to inmate safety. CoreCivic is a citizen of Tennessee with its principal place of business and corporate headquarters located in Brentwood, Tennessee. CoreCivic may be served with process through its registered agent at CoreCivic of Tennessee, LLC, Registered Agent: C T CORPORATION SYSTEM, 300 MONTVUE RD., KNOXVILLE, TN 37919-5546.

17.     Defendant Damon Hininger is the Chief Executive Officer of CoreCivic. Mr. Hininger's commitment to prioritizing shareholder profit over inmate safety gave rise to the chronically unconstitutional understaffing and misclassification conditions that resulted in Mr. Childress's preventable death. Defendant Hininger may be served at his residence or wherever he may be found.

18.     Defendant Steve Conry is CoreCivic's Vice President of Operations Administration. As the primary individual responsible for ensuring that CoreCivic's facilities are adequately staffed and that staff are trained properly, Mr. Childress's murder is directly attributable to Mr. Conry's failed oversight and calculated, profit-motivated understaffing decisions. Defendant Conry may be served at his residence or wherever he may be found.

-9-

19.     Defendant Raymond Byrd was the warden of Trousdale Turner Correctional Center at all times relevant to this Complaint. As Trousdale Turner Correctional Center's day-to-day overseer who was responsible for supervising its staff—including staff members who were responsible for maintaining adequate staffing and staff members who were responsible for inmate classification—Mr. Childress's murder is directly attributable to Mr. Byrd's deliberate indifference to Trousdale Turner Correctional Center's chronically unconstitutional understaffing and misclassification conditions. Defendant Byrd may be served at his residence or wherever he may be found.

20.     Defendant Shawna Curtis was a classification counselor at Trousdale Turner Correctional Center at the time Mr. Childress was murdered and the individual who misclassified Mr. Childress's murderer. Despite inmate Tymothy Willis's violent criminal history and institutional history, Defendant Curtis misclassified Tymothy Willis as a low security risk and minimum custody inmate when he was not. As a result of that misclassification, Tymothy Willis was housed with Mr. Childress, a low security risk inmate whom Tymothy Willis brutally murdered. Defendant Curtis may be served at her residence or wherever she may be found.

### III.  JURISDICTION, VENUE, AND AUTHORITY

21.     This Court has jurisdiction over the Plaintiffs' federal claims in this civil action pursuant to 28 U.S.C. § 1331.

22.     This Court has supplemental jurisdiction to adjudicate the Plaintiffs' state law claims related to the Plaintiffs' federal claims in this action pursuant to 28 U.S.C. § 1367(a).

23.     As the judicial district in which a substantial part of the events or omissions giving rise to the Plaintiffs' claims occurred, venue is proper in this Court pursuant to 28

U.S.C. § 1391(b)(2). Venue is independently proper in this Court pursuant to 28 U.S.C. § 1391(b)(1).

24. Plaintiff Newby has authority to maintain her own claims individually and to maintain this wrongful death action as next-of-kin to Mr. Childress and as the personal representative of Mr. Childress's estate pursuant to Tenn. Code Ann. § 20-5-107(a).

## IV. FACTUAL ALLEGATIONS

25. On February 23, 2021, Terry Childress appeared for a parole hearing in advance of his forthcoming release date.

26. On February 24, 2021, Terry Childress was brutally murdered in his prison cell at Trousdale Turner Correctional Center by his violent and misclassified cellmate, Tymothy Willis.

27. The cause of Mr. Childress's death was "blunt force injuries of the head," and the manner of death was "homicide."[11] Mr. Childress also suffered two broken ribs as a result of Tymothy Willis's assault.

28. Mr. Childress was 37 years old at the time of his murder. He left behind his mother, siblings, and other family members and friends who loved him very much.

29. Video surveillance footage inside Trousdale Turner Correctional Center confirms that corrections officers were not making timely rounds at the time of Mr. Childress's murder. As a result, no corrections officers were nearby to hear Mr. Childress being viciously assaulted by Tymothy Willis, notwithstanding reports of "escalating arguments" between them.[12] Thus, no corrections officers were nearby to intervene and

---

[11] **Ex. 7,** Report of Investigation by County Medical Examiner at 5.

[12] *Id.*

prevent the assault from becoming fatal.

30.     Tymothy Willis did not have any serious injuries and was not defending himself when he murdered Mr. Childress.  At the time he murdered Mr. Childress, Tymothy Willis also sported a tattoo that simply stated: "Death."



CCI 000027

31.     The reason why officers were not making timely rounds at Trousdale Turner Correctional Center at the time of Mr. Childress's murder and were unavailable to prevent Tymothy Willis's assault of Mr. Childress from becoming fatal is because Trousdale Turner Correctional Center—and the unit where Mr. Childress was housed in particular—was understaffed.  The understaffed positions in Mr. Childress's housing unit are "critical" positions that must be staffed under Tennessee Department of Correction policy.

-12-

32.     Defendants CoreCivic, Hininger, Conry, and Byrd knew that Trousdale Turner Correctional Center was chronically understaffed and that critical posts routinely went unstaffed at the time of Mr. Childress's murder.  They also willfully understaffed Trousdale Turner Correctional Center because doing so was and remains more profitable.

33.     According to a former Trousdale Turner Correctional Center officer, understaffing Trousdale Turner Correctional Center "definitely" helps CoreCivic save money, and "they would much rather pay, you know, eight officers on night shift a bunch of overtime to run that entire facility, you know, versus having three officers per unit 24 hours a day, which they're supposed to."[13]

34.     At the time that Mr. Childress was murdered, he was a low security risk.

35.     At the time that Mr. Childress was murdered, Tymothy Willis was misclassified as a low security risk inmate who should have been designated—at minimum—a medium security inmate.[14]

36.     Even though Trousdale Turner Correctional Center was designed to be a minimum security facility and is "not supposed to house anybody with medium to maximum points," it regularly and improperly accepts higher security level inmates, resulting in "a huge mix of different security levels under one roof."[15]  This mixture of inmate security levels dramatically increases the risk of inmate-on-inmate violence.  A former Trousdale Turner Correctional Center officer describes this situation as "like adding a gallon of gasoline to an open flame."[16]

---

[13] *See* **Ex. 1** at 34:3–10.

[14] *See generally* **Ex. 8,** Decl. of Roy T. Gravette.

[15] **Ex. 1**, at 13:18–14:2.

[16] *Id.* at 14:4–5.

37.     At the time Mr. Childress was murdered, CoreCivic had actual knowledge that Mr. Willis posed a heightened security risk and was a volatile, dangerous inmate with a history of violence.

38.     At the time Mr. Childress was murdered, CoreCivic had actual knowledge that Mr. Willis was a violent offender who had been convicted of a violent offense involving the use of a deadly weapon and had a long history of felony convictions. Tymothy Willis's "Offender Attributes" profile dated 7/31/2018 also designated Mr. Willis as a "High Risk: Violent" inmate with a "Maximum" custody level:



CCI 000314

39.     Based on generally accepted practices in prison management, a recent maximum custody level inmate like Tymothy Willis should not have been classified as a minimum custody level inmate a mere two-and-a-half years after receiving a maximum custody level classification.

40.     Based on generally accepted practices in prison management, a recent maximum custody level inmate like Tymothy Willis should not have been housed in a Special Housing Unit with a minimum security inmate like Mr. Childress a mere two-and-a-half years after receiving a maximum custody level classification.

41.     Based on generally accepted practices in prison management, a recent maximum custody level inmate like Tymothy Willis should not have been housed in a Special Housing Unit with a minimum security inmate like Mr. Childress in a cell with no windows or means of escape if one inmate attacks another.

42.     Defendant CoreCivic's own reports regarding Mr. Childress's murderer expressly refer to Mr. Willis as a medium security inmate.  Generally accepted practice in the prison management field also required classifying Mr. Willis as—at minimum—a medium security inmate considering his violent criminal and institutional history.

43.     Despite Tymothy Willis's long history of violence, numerous felony convictions, and poor institutional record—including serious disciplinary reports and an institutional incident report in the previous six months before he murdered Mr. Childress—Defendant Curtis misclassified Tymothy Willis as a low security risk and minimum custody inmate who had just two "points."  Mr. Willis should instead have been classified as at least a medium custody inmate who had at least thirteen points.

44.     In addition to Defendant Curtis misclassifying Tymothy Willis notwithstanding Willis's documented violent history and institutional record, at the time

-15-

of Mr. Childress's murder, Defendants CoreCivic and Byrd had specific knowledge that Mr. Willis was an informant on the compound—otherwise known as a "snitch"[17]—and that he posed a heightened danger to anyone with whom he was housed as a result.

45. Because Tymothy Willis had acted as an informant, shortly before Mr. Childress's murder, Tymothy Willis "had gotten a message from everybody in Segregation [that] was like, 'Look, if you don't take out your cellie, we're going to take you out. But you have to leave this facility some way or another.' And the only way out -- he could get out was killing somebody."[18]

46. As a result of the threats that he received from other inmates at Trousdale Turner Correctional Center, Tymothy Willis brutally murdered Mr. Childress in order to ensure his prompt transfer out of Trousdale Turner Correctional Center.

47. Nobody employed by CoreCivic intervened while Tymothy Willis murdered Mr. Childress, because nobody employed by CoreCivic was around to hear it. Video surveillance reveals that corrections officers were not nearby at the time of Mr. Childress' murder and that they did not return to Mr. Childress's cell for an extended time period that was longer than normal rounds and adequate staffing required.

48. CoreCivic has actual knowledge that its surveillance footage proves its understaffing and associated liability arising from Mr. Childress's preventable murder. In an effort to conceal its liability and its actionable deliberate indifference, however, CoreCivic has withheld release of that footage to Plaintiffs under the pretense of security concerns that are not genuine.

49. On a routine basis, Trousdale Turner Correctional Center's Special Housing

---

[17] **Ex. 1** at 31:12–13.

[18] *Id.* at 31:14–18.

-16-

Unit has only two of its positions staffed, requiring each of the officers on duty to do the work of three officers in addition to doing his or her individually assigned job. As a direct result of this understaffing, rounds were not conducted either properly or timely in the Special Housing Unit during the time period leading up to Mr. Childress' murder. When conducting rounds, officers routinely failed to verify the inmates' status properly in violation of TDOC policy and generally accepted practices in prison management. Neither were checks conducted with the frequency required by TDOC policy and generally accepted practices in prison management. As a result of these chronic failures, Tymothy Willis was aware that he could murder Mr. Childress without intervention from any nearby officers, who would not discover the assault until after Mr. Childress was dead.

50. As of December 2020—approximately two months before Mr. Childress's murder—only two of the five positions in Trousdale Turner Correctional Center's Special Housing Unit were staffed. Trousdale Turner Correctional Center also continued to remain severely understaffed thereafter.

51. Adequate staffing would have enabled CoreCivic's officers to respond to Tymothy Willis's assault of Mr. Childress and to prevent that assault from becoming fatal.

52. Trousdale Turner Correctional Center's understaffing is so severe that two units holding 360 inmates are often manned by just a single officer. Such severe understaffing is woefully insufficient to prevent serious injury to inmates resulting from inmate-on-inmate violence. It is also reasonably foreseeable that such gross understaffing will result in an increased number of inmate-on-inmate assaults and that those assaults will be more severe due to the absence of intervention from officers.

53. CoreCivic routinely staffs Trousdale Turner Correctional Center with just a single officer per unit, which is woefully insufficient to maintain a constitutionally

-17-

adequate level of inmate safety in the facility.

54. CoreCivic has—and it has long had—actual knowledge that Trousdale Turner Correctional Center is severely understaffed. Indeed, Trousdale Turner Correctional Center is understaffed *deliberately*, because paying for sufficient staffing is expensive and understaffing is more profitable.

55. Generally speaking, the less money that CoreCivic spends on staff and inmate safety at Trousdale Turner Correctional Center, the higher CoreCivic's profit margin. In all instances, CoreCivic acts to maximize profit for the benefit of its shareholders.

56. Given its focus on maximizing profit, CoreCivic routinely fails to meet constitutionally adequate safety standards at Trousdale Turner Correctional Center, resulting in recurring, preventable, and disproportionately high instances of inmate-on-inmate assaults and deaths.

57. Inmates at Trousdale Turner Correctional Center—including Terry Childress—have died and continue to die needlessly as a result of Trousdale Turner Correctional Center's premeditated and profit-motivated understaffing choices.

58. Defendant Hininger—CoreCivic's Chief Executive Officer—has actual knowledge of Trousdale Turner Correctional Center's chronic understaffing. Even so, he has willfully failed to remedy Trousdale Turner Correctional Center's deliberate indifference to inmate safety, both because understaffing is more profitable and because he does not care when inmates in CoreCivic's care needlessly die.

59. Defendant Conry, CoreCivic's Vice President of Operations Administration, also has actual knowledge of Trousdale Turner Correctional Center's endemic understaffing. Even so, he has similarly failed to remedy Trousdale Turner Correctional

-18-

Center's understaffing and the heightened risk of fatal inmate-on-inmate violence resulting from it, because understaffing is profitable and because he, too, is unbothered when inmates in CoreCivic's care needlessly die.

60.     Defendant Byrd—who was the warden of Trousdale Turner Correctional Center at the time of Mr. Childress's preventable murder—was similarly aware of Trousdale Turner Correctional Center's extreme understaffing problems.  Indeed, he observed them personally almost every single day that he served as warden.  Even so, Defendant Byrd consciously neglected to remedy Trousdale Turner Correctional Center's chronic understaffing despite his personal knowledge of the extraordinary and frequently fatal inmate-on-inmate violence enabled by it.

61.     Owing to the fact that the Defendants' tortious misconduct caused Mr. Childress to die from his injuries, Mr. Childress was unable to exhaust administrative remedies regarding the causes of action at issue in this Complaint in advance of its filing.

## V.  CAUSES OF ACTION

### Claim #1: 42 U.S.C. § 1983—Deliberate Indifference to and Failure to Prevent Foreseeable Inmate-on-Inmate Violence (As to all Defendants)

62.     The Plaintiffs incorporate and reallege the foregoing allegations as if fully set forth herein.

63.     At all times relevant to this Complaint, all Defendants had legal duties under the Eighth Amendment to protect Mr. Childress from violence at the hands of other prisoners and to ensure Mr. Childress's reasonable safety at Trousdale Turner Correctional Center.

64.     CoreCivic has an unconstitutional policy or practice of maintaining staffing levels that are insufficient to ensure that inmates like Mr. Childress are protected from

inmate-on-inmate violence.

65. All Defendants are and may be held liable for acting with deliberate indifference to Mr. Childress's safety at Trousdale Turner Correctional Center.

66. Defendants CoreCivic, Hininger, Conry, and Byrd failed to protect Mr. Childress from a known risk of violence at the hands of another prisoner.

67. All Defendants failed to ensure Mr. Childress's reasonable safety at Trousdale Turner Correctional Center.

68. All Defendants acted with deliberate indifference to Mr. Childress's safety while he was an inmate at Trousdale Turner Correctional Center.

69. Defendants CoreCivic, Hininger, Conry, and Byrd knew that Mr. Childress faced a substantial risk of serious harm at Trousdale Turner Correctional Center as a result of its chronic understaffing. Similarly, Defendant Curtis knew that misclassifying a violent and dangerous inmate like Tymothy Willis as a low security risk created a heightened and specific risk of violence to any low security cellmate with whom Tymothy Willis was housed.

70. Defendants CoreCivic, Hininger, Conry, Byrd, and Conry disregarded known risks to Mr. Childress at Trousdale Turner Correctional Center by failing to take reasonable measures to abate them.

71. Defendants CoreCivic, Hininger, Conry, and Byrd were actually aware of the specific and particularized risks of serious harm posed to inmates like Mr. Childress as a consequence of, *inter alia*, CoreCivic's deliberate understaffing of Trousdale Turner Correctional Center; CoreCivic's failure to properly train and supervise the staff at Trousdale Turner Correctional Center to ensure adequate staffing levels; Trousdale Turner Correctional Center's failure to adhere to safety protocols; and Trousdale Turner

Correctional Center's failure to classify and house inmates in its care correctly and in accordance with generally accepted practices in prison management.

72.    At the time Mr. Childress was murdered, Trousdale Turner Correctional Center was plagued by constant and pervasive risks of physical harm to inmates.

73.    At the time Mr. Childress was murdered, Trousdale Turner Correctional Center's pervasive risk of harm to inmates manifested in actual harm and a dramatically outsized number of serious inmate-on-inmate attacks, only a fraction of which were ever officially documented.

74.    At the time Mr. Childress was murdered, Trousdale Turner Correctional Center was plagued by longstanding, pervasive, well-known, and expressly observed inmate-on-inmate attacks that routinely went unreported to state regulators.

75.    At the time Mr. Childress was murdered, Defendants CoreCivic, Hininger, Conry, and Byrd had been exposed to information concerning the risk of physical harm to inmates housed at Trousdale Turner Correctional Center, including audits by regulators, and they must have known about it.

76.    At the time Mr. Childress was murdered, Defendants CoreCivic, Hininger, Conry, and Byrd had actual or constructive knowledge of the constant and pervasive risk of physical harm to inmates generally and to Mr. Childress specifically at Trousdale Turner Correctional Center.

77.    Defendants CoreCivic, Hininger, Conry, and Byrd were additionally aware of the specific and particularized risk of serious harm posed to inmates like Mr. Childress as a consequence of the fact that—rather than maintaining inmate safety—CoreCivic's officers facilitate violence within Trousdale Turner Correctional Center by smuggling in drugs and needles to enable the drug trade, drug use, and the spread of contraband within

-21-

the facility.

78.    To the extent that CoreCivic attempts to segregate violent inmates from non-violent inmates at Trousdale Turner Correctional Center, such attempts are rendered ineffectual by the facts that inmates are misclassified; are not meaningfully secured in their cells; and that entire pods are often left unsecured—even during lockdowns—due to understaffing.   In combination with these chronic failures, Defendant Curtis's misclassification of Tymothy Willis proximately enabled Mr. Childress's preventable murder.

79.    Despite Defendants CoreCivic's, Hininger's, Conry's, and Byrd's actual awareness of the severe risks to inmate safety within Trousdale Turner Correctional Center, they consciously and deliberately failed to address those risks because deliberate indifference to inmate safety is more profitable.

80.    Because so many previous deaths at Trousdale Turner Correctional Center have not been met with meaningful remedial action, CoreCivic continues to maintain a chronically unsafe and understaffed facility, because it does not expect that regulators or this Court will take any meaningful remedial action against it.

### CLAIM #2: LIABILITY UNDER *MONELL V. DEPT. OF SOCIAL SERVICES*, 436 U.S. 658 (1978) (AS TO DEFENDANT CORECIVIC)

81.    The Plaintiffs incorporate and reallege the foregoing allegations as if fully set forth herein.

82.    Defendant CoreCivic has adopted a policy and practice of severely understaffing its facilities, including Trousdale Turner Correctional Center, without regard to inmate safety because understaffing is more profitable.

83.    As a result of multiple audits identifying Trousdale Turner Correctional

Center's severe understaffing issues and thousands of violent incidents—both reported and unreported—at the facility over a period of years, CoreCivic had actual knowledge of Trousdale Turner Correctional Center's chronic understaffing problems, but it opted not to staff Trousdale Turner Correctional Center adequately because doing so would have been less profitable.

84.    At the time of Mr. Childress's murder, CoreCivic's employees—including Defendants Hininger, Conry, and Byrd—had actual knowledge that Trousdale Turner Correctional Center's chronic understaffing problems resulted in an extraordinary and outsized level of inmate-on-inmate violence at the facility.

85.    CoreCivic's policy and practice of understaffing is widespread, rampant, and endemic to CoreCivic's prison facilities, including Trousdale Turner Correctional Center.

86.    Defendants CoreCivic, Hininger, Conry, and Byrd knew of the heightened and chronic safety risks to inmates resulting from understaffing at Trousdale Turner Correctional Center, but they tolerated, maintained, and promoted understaffing to generate greater profits for CoreCivic at the expense of the safety of inmates like Mr. Childress.

87.    Mr. Childress's death is attributable to Defendant CoreCivic's policy and practice of failing to ensure adequate staffing at its prison facilities, including Trousdale Turner Correctional Center, which was explicitly or impliedly authorized by Hininger, Conry, and Byrd, and in which they knowingly acquiesced in accordance with CoreCivic's policy, custom, and practice of prioritizing profit over inmate safety.

88.    If Trousdale Turner Correctional Center's Special Housing Unit had been properly supervised and staffed, Mr. Childress would not be dead.

89.    Trousdale Turner Correctional Center's chronic understaffing also

-23-

continues to remain unremedied even after Mr. Childress's death. Indeed, several more inmates have died at Trousdale Turner Correctional Center following Mr. Childress's death—including as recently as January 2022—and inmates continue to die there with dramatically outsized frequency. In many cases, such deaths are kept hidden from and unreported to the public.

CLAIM #3: TENNESSEE COMMON LAW NEGLIGENCE
(AS TO DEFENDANTS CORECIVIC, BYRD, AND CURTIS)

90.     The Plaintiffs incorporate and reallege the foregoing allegations as if fully set forth herein.

91.     Defendants CoreCivic, Byrd, and Curtis owed a legal duty of care to Mr. Childress to protect him from reasonably foreseeable harm.

92.     Because Tymothy Willis was a known informant and violent inmate whose safety had been threatened if he did not murder his cellmate, Defendants CoreCivic and Byrd knew of or had reasons to anticipate an attack on Mr. Childress by Tymothy Willis, but they did not use reasonable care to prevent it.

93.     Based on Tymothy Willis's violent and dangerous history and his institutional history, Defendant Curtis knew that misclassifying Tymothy Willis as a low security inmate posed a specific risk of physical harm to any low security cellmate with whom Tymothy Willis was housed. Similarly, based on Tymothy Willis's violent and dangerous history, his institutional history, his status as an informant on the compound, and specific threats communicated to Tymothy Willis by other inmates if he did not murder Mr. Childress, Defendants CoreCivic and Byrd had actual and constructive notice of the risk of foreseeable harm that Tymothy Willis posed to Mr. Childress specifically, and they had reason to anticipate the attack.

-24-

94. Accordingly, Defendants CoreCivic and Byrd knew or should have known that Mr. Childress would become the victim of an attack by Tymothy Willis, but they failed to use reasonable care to prevent it.

95. Defendants CoreCivic's, Byrd's, and Curtis's breaches of their duty of care to Mr. Childress proximately caused Mr. Childress to die at the hands of his violent, dangerous, and misclassified cellmate.

### CLAIM #4: LOSS OF CONSORTIUM
#### (AS TO ALL DEFENDANTS)

96. The Plaintiffs incorporate and reallege the foregoing allegations as if fully set forth herein.

97. Tennessee allows for an award of damages for loss of filial consortium and other damages for the death of one's child under Tenn. Code Ann. § 20–5–113. *See Hancock v. Chattanooga-Hamilton Cty. Hosp. Auth.*, 54 S.W.3d 234, 236 (Tenn. 2001).

98. The Defendants' wrongful acts, faults, omissions, and tortious misconduct caused Ms. Newby to suffer a loss of filial consortium and other damages arising from the death of her beloved son.

99. Accordingly, Ms. Newby is entitled to an award of damages, including the pecuniary value of Mr. Childress's life and the loss of her son's attention, guidance, care, protection, companionship, cooperation, affection, and love.

### CLAIM #5: TENN. CODE ANN. § 1-3-121
#### (AS TO DEFENDANT CORECIVIC)

100. The Plaintiffs incorporate and reallege the foregoing allegations as if fully set forth herein.

101. Defendant CoreCivic knowingly and deliberately fails to ensure a

constitutionally adequate level of inmate safety at its Tennessee-based facilities.

102. Defendant CoreCivic knowingly and deliberately fails to ensure a constitutionally adequate level of inmate safety at its Tennessee-based facilities because it is cheaper and more profitable not to do so and because it does not fear meaningful regulatory or judicial consequences if it maintains understaffed facilities.

103. In an effort to prevent the fact of its chronic, profit-motivated deliberate indifference to inmate safety from reaching Tennessee regulators, legislators, and others, Defendant CoreCivic fails to document, disposes of, takes measures to conceal, and falsifies records and evidence of its deliberate indifference to inmate safety.

104. Tenn. Code Ann. § 1-3-121 enables plaintiffs to vindicate claims for declaratory and injunctive relief in cases involving illegal and unconstitutional government action. It specifically provides that: "Notwithstanding any law to the contrary, a cause of action shall exist under this chapter for any affected person who seeks declaratory or injunctive relief in any action brought regarding the legality or constitutionality of a governmental action."

105. Defendant CoreCivic's chronic deliberate indifference to inmate safety contravenes the provisions of the Eighth Amendment to the United States Constitution.

106. Defendant CoreCivic's actions additionally contravene Tenn. Const. art. I, § 32, which provides that: "That the erection of safe prisons, the inspection of prisons, and the humane treatment of prisoners, shall be provided for."

107. Absent, at minimum, regular independent monitoring and unannounced inspections designed to determine whether Defendant CoreCivic has remedied its chronic and profit-motivated deliberate indifference to inmate safety and other unlawful conduct described above, CoreCivic will continue to act both illegally and unconstitutionally with

-26-

respect to its operation of Trousdale Turner Correctional Center.

108.    To remedy CoreCivic's chronically illegal and unconstitutional actions at Trousdale Turner Correctional Center, this Court should appoint an independent monitor to conduct regular unannounced inspections of Trousdale Turner Correctional Center and report whether Defendant CoreCivic has remedied its chronic and profit-motivated unlawful conduct.

109.    In the absence of CoreCivic coming into compliance with its obligation to ensure a constitutionally adequate level of inmate safety, this Court should issue an injunction permanently enjoining Defendant CoreCivic from continuing to operate Trousdale Turner Correctional Center going forward.

## VI.  PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs pray for the following relief:

1.    That proper process issue and be served upon the Defendants, and that the Defendants be required to appear and answer this Complaint within the time required by law;

2.    That the Plaintiffs be awarded all compensatory, consequential, and incidental damages to which they are entitled in an amount not less than $2,500,000.00;

3.    That the Plaintiffs be awarded punitive damages of not less than $7,500,000.00;

4.    That Defendant CoreCivic's profits arising from its chronically unconstitutional understaffing at Trousdale Turner Correctional Center be disgorged;

5.    That the Plaintiffs be awarded all costs and discretionary costs of trying this action;

6.    That the Plaintiffs be awarded their reasonable attorney's fees pursuant to

-27-

42 U.S.C. § 1988(b) and an appropriate multiplier of said fees;

7. That a jury of 12 be empaneled to try this cause;

8. That pre-judgment and post-judgment interest be awarded to the Plaintiffs;

9. That this Court declare that CoreCivic acted illegally by failing to ensure a constitutionally adequate level of inmate safety at Trousdale Turner Correctional Center;

10. That this Court appoint an independent monitor to conduct regular unannounced inspections of Trousdale Turner Correctional Center and report whether Defendant CoreCivic has remedied its chronic and profit-motivated unlawful conduct, and that this Court issue an injunction permanently enjoining Defendant CoreCivic from continuing to operate Trousdale Turner Correctional Center if it fails to do so; and

11. That the Plaintiffs be awarded all further relief to which they are entitled.

Respectfully submitted,

/s/ Daniel A. Horwitz
Daniel A. Horwitz, BPR #032176
Lindsay E. Smith, BPR #035937
HORWITZ LAW, PLLC
4016 Westlawn Dr.
Nashville, TN 37209
daniel@horwitz.law
lindsay@horwitz.law
(615) 739-2888

Brice M. Timmons #29582
Craig A. Edgington #38205
DONATI LAW, PLLC
1545 Union Ave.
Memphis, Tennessee 38104
(901) 278-1004 – Telephone
(901) 278-3111 – Facsimile
brice@donatilaw.com
craig@donatilaw.com

*Attorneys for Plaintiffs*

-28-